IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NEVA WILLIAMS *et al.*,

      Plaintiffs,

v.                                      Civ. No. 23-1059 GBW/KRS

NEW MEXICO STATE UNIVERSITY *et al.*,

      Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment Regarding Plaintiffs' Counts I, II, III, VI, VII, VIII, and IX. *Doc. 69*. Having reviewed the briefing, *docs. 73, 74, 94, 111*, conducted a hearing, *doc. 117*, and being otherwise fully advised, the Court will GRANT the Motion in part and DENY it in part. Plaintiffs' associated request for relief under Rule 56(d) is DENIED.

### I.      Background

Plaintiffs Neva Williams, Jane Doe 2, and Jane Doe 3 were students at New Mexico State University (NMSU) who at various times between 2009 and 2022 studied under Defendant Joseph Berning, a professor in the kinesiology department. The complaint alleges repeated sexual abuse of all three plaintiffs by Dr. Berning, and of Ms. Williams by Dr. Berning's partner, Carole Carson, also an employee of NMSU.

Ms. Williams filed suit in state court on June 30, 2022. *Doc 111-1.* The case was removed on November 28, 2023. *Doc. 1.* Jane Doe 2 and Jane Doe 3 filed suit in this district on April 18, 2024. *See* Civ. No. 24-371 GJF/GBW, *doc. 1.* Their claims were consolidated into the instant action on May 17, 2024, *doc. 35*, and their first action was voluntarily dismissed. The operative complaint asserts claims against Dr. Berning and Ms. Carson based on the alleged abuse, and against the remaining defendants based on their involvement in and failure to prevent or rectify the misconduct.

Defendants move for summary judgment on Plaintiffs' claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985, the New Mexico Tort Claims Act (NMTCA), and the New Mexico Civil Rights Act (NMCRA), on the basis that Plaintiffs' claims were filed outside the statute of limitations and that any acts alleged within the statutory period did not violate Plaintiffs' rights.

## II.     Undisputed Material Facts

The Court finds the following facts are material and undisputed for purposes of this motion:[1]

---

[1] In their first response to Defendants' motion, Plaintiffs objected generally that Defendants' evidence is inadmissible because the documents are "unreliable," lack foundation, and have not been authenticated. *Doc. 73* at 22–23. As an initial matter, the Federal Rules allow a party to object that cited material "*cannot* be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2) (emphasis added); they do not require summary judgment evidence to be in admissible form. Moreover, Plaintiffs did not reprise these objections in their supplemental response and, in their late-filed response to Defendants' Undisputed Material Facts, did not dispute the listed facts. *See docs. 73, 94.* Therefore, to the extent Plaintiffs' objections apply to the listed facts, they are overruled.

1.      Dr. Berning was a professor at NMSU in the kinesiology department from 2003 to 2022.  PUMF 1.[2]

2.      Ms. Carson was an adjunct professor at NMSU.  PUMF 2.

3.      Dr. Berning held various leadership positions during his time at NMSU and was a powerful and influential figure in the kinesiology department.  PUMF 3–4.

4.      Dr. Berning controlled access to the exercise physiology lab, to which only a select few students received a key.  PUMF 8.

5.      In 2013, NMSU's Office of Institutional Equity (OIE) received a complaint from a female student that Dr. Berning had touched her inappropriately while hugging.  OIE determined a violation of policy had occurred.  Dr. Berning was counseled and required to attend a sexual harassment training.  *Doc. 104-10*.

6.      Ms. Williams enrolled at NMSU in fall 2009.  DUMF 1.

7.      In 2013, when Ms. Williams was a student in Dr. Berning's anatomy class, she sought out his mentorship.  Dr. Berning suggested they learn about each other and asked Ms. Williams about her sexual fantasies.  PUMF 19, PUMF 20.

8.      Dr. Berning's mentorship of Ms. Williams included special favors such as a key to the lab, a job working for Ms. Carson, and taking her on trips.  PUMF 23.

---

[2] "PUMF" refers to Plaintiffs' Additional Material Facts (*doc. 95* at 3–21) and "DUMF" refers to Defendants' Undisputed Material Facts (*doc. 69* at 2–4).  Where the Court cites exclusively to one of the parties' UMFs, it does so pursuant to Rule 56(e)(2), because the UMF in question was not specifically disputed.  *See* Fed. R. Civ. P. 56(e)(2).  Where the Court cites to evidence in the record, it does so pursuant to Rule 56(c)(3), which permits consideration of "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

9.    During a training session, Dr. Berning pressed himself into Ms. Williams from behind, held her tightly against him and instructed her to feel his muscles. He showed her videos of love songs while holding her on his lap and told her the song reminded him of her. PUMF 21.

10.   Ms. Williams did not see Dr. Berning much in 2015. When they reconnected in 2016, he sent her an email describing a sexual fantasy dream he had about her. PUMF 24.

11.   Dr. Berning again fostered an intense "mentorship" of Ms. Williams, calling her his "mini-me" and conferring benefits such as grade inflation and a paid position for which she did not work. PUMF 25.

12.   At one point, Dr. Berning took Ms. Williams to the NMSU student medical center and pretended to be her uncle so that he could accompany her into the exam room. PUMF 29.

13.   Dr. Berning opened a bank account for Ms. Williams to which he had access, paid her tuition, and bought her a truck with his name on the title. PUMF 30.

14.   Dr. Berning brought Ms. Williams to the lab, showed her pornography, and undressed and manipulated his genitals in front of her. PUMF 31.

15.   While at Dr. Berning's home garage, Dr. Berning pushed Ms. Williams against machinery, pulled her jeans down, and penetrated her. PUMF 32.

16.    Dr. Berning often had sex with Ms. Williams without her consent, including in the lab, in his office and at other locations around campus.  PUMF 34.

17.    Dr. Berning wrote Ms. Williams' resume, prepared her for nursing board examinations and transported her there, and arranged a job working with Ms. Carson for her nursing preceptorship.  PUMF 35.

18.    During a trip to Denver in 2017, Dr. Berning manipulated Ms. Williams' arm and hand to masturbate him.  On another trip, he became angry when Ms. Williams said she did not want to cheat on her boyfriend, and told her she needed to show him she was willing to participate in his mentoring.  PUMF 36.

19.    On May 12, 2017, Ms. Williams graduated with a degree in nursing.  DUMF 2.

20.    Toward the end of 2017, Dr. Berning and Ms. Carson asked Ms. Williams to move in with them.  She accepted and did so.  PUMF 38.

21.    Dr. Berning continued to exert control over Ms. Williams' financial decisions and professional path.  As part of his "mentorship," she engaged in sexual activities, including sex with Dr. Berning and Ms. Carson, penetration of Dr. Berning, and other unusual sexual acts.  PUMF 42.

22.    Ms. Williams moved out of Dr. Berning's home in August 2019.  PUMF 44.

23.    Jane Doe 3 was a kinesiology student at NMSU from fall 2011 through December 9, 2016.  DUMF 6, DUMF 7, PUMF 53.

24.    Jane Doe 3 developed a close mentorship relationship with Dr. Berning.  They

       met often, discussed personal matters including Jane Doe 3's history of sexual

       assault, and went on trips together.   PUMF 54, PUMF 55.

25.    On one occasion, Dr. Berning attempted sexual contact with Jane Doe 3 and

       kissed her.  PUMF 55.

26.    After graduating, Jane Doe 3 remained at NMSU as an employee until 2020.

       PUMF 56.

27.    Dr. Berning regularly made sexual remarks toward Jane Doe 3 and physically

       accosted her.  On one occasion he hugged her in his office and grabbed her in a

       private area.  PUMF 56.

28.    Dr. Berning convinced Jane Doe 3 to participate in a photoshoot for a magazine

       during which he grabbed and groped her body.  PUMF 57.

29.    Jane Doe 2 was a kinesiology student at NMSU who developed a mentorship

       relationship with Dr. Berning after taking his anatomy class in 2016.  PUMF 64.

30.    Dr. Berning called Jane Doe 2 his "mini-me," took her to restaurants off campus

       on multiple occasions, and commented that the places were "romantic."  PUMF

       65.

31.    Jane Doe 2 graduated from NMSU on August 2, 2018, with a degree in

       kinesiology.  DUMF 4, PUMF 66.

32.    In 2020, Jane Doe 2 reengaged Dr. Berning for further mentorship.  PUMF 66.

33.     Jane Doe 2 began graduate school at NMSU in fall 2020.  PUMF 69.

34.     Shortly after Jane Doe 2 arrived on campus, she participated in a photoshoot

with Dr. Berning during which he groped and touched her body.  PUMF 69.

35.     Dr. Berning granted Jane Doe 2 special privileges, such as a key to the lab.

PUMF 70.

36.     In fall 2020, Jane Doe 2 received a message from Ms. Williams.  After several

months, she spoke with Ms. Williams, who told her to be careful and described

her own experiences.  Ms. Williams shared that Dr. Berning had talked about

Jane Doe 2's body and how he liked it.  PUMF 71.

37.     In spring 2021, Jane Doe 2 contacted Dr. Berning to discuss how to begin her

research project.  He refused to allow her to use the lab.  Jane Doe 2 needed

access to the lab or her program would be derailed.  PUMF 72, PUMF 73.

38.     Jane Doe 2 told Defendant Phillip Post that Dr. Berning had denied her access to

the lab, and what she had heard from Ms. Williams.  PUMF 73.

39.     On March 31, 2021, OIE initiated an investigation based on information provided

by Dr. Post about the conversation between Ms. Williams and Jane Doe 2.  *Doc.*

*104-4* at 18.

40.     On April 14, 2021, OIE issued Temporary No Contact Orders to Ms. Carson, Ms.

Williams, and Dr. Berning.  DUMF 13.

41.    Dr. Berning was placed on paid administrative leave on April 14, 2021.  DUMF
       14.

42.    Ms. Carson was placed on paid administrative leave on April 21, 2021.  DUMF
       15.

43.    Following an investigation, OIE issued a draft investigative report and the matter
       was set for hearing on July 13, 2022.  PUMF 83.

44.    On July 28, 2022, Dr. Berning entered into a settlement agreement with NMSU.
       Pursuant to its terms, Dr. Berning agreed to retire effective July 13, 2022, at 5:00
       PM.  NMSU agreed to vacate the Title IX hearing because Dr. Berning was "no
       longer an active employee."  *Doc. 104-2.*

III.    **Legal Standard**

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The
movant bears the initial burden of showing "that there is an absence of evidence to
support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d
887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once
the movant meets this burden, the non-moving party is required to designate specific
facts showing that "there are . . . genuine factual issues that properly can be resolved
only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citations omitted).

In applying this standard, the Court must draw all "reasonable inferences" in favor of the non-moving party. *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998). Summary judgment is appropriate only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.    Rule 56(d) Request

Rule 56(d) allows the court to defer consideration of a summary judgment motion where the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). To obtain relief, the nonmovant provides an affidavit or declaration "(1) identifying the probable facts that are unavailable, (2) stating why these facts cannot be presented without additional time, (3) identifying past steps to obtain evidence of these facts, and (4) stating how additional time would allow for rebuttal of the adversary's argument for summary judgment." *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1110 (10th Cir. 2017).

Plaintiffs requested relief and provided an affidavit in their response brief. *Docs. 73, 73-1.* The request was renewed in their supplemental response. *Doc. 94* at 4 n.2. The renewed request was not accompanied by a renewed affidavit. Therefore, any grounds for relief not presented in the first response and its accompanying affidavit will not be considered. *See Cerveny*, 855 F.3d at 1110 ("The Cervenys' summary judgment response arguably contains the information required in Rule 56(d). But we may not look beyond the affidavit in considering a Rule 56(d) request.").

Based on the supplemental responses, it appears Plaintiffs have successfully obtained information through discovery about Dr. Berning's position and role at NMSU, Dr. Berning and Ms. Carson's relationship, and past complaints about Berning. Plaintiffs have also obtained their expert reports. Although Plaintiffs contend they need additional discovery about Dr. Berning's "mentorship activities" and his "full role at NMSU," *doc. 94* at 4 n.2, it is unclear what information they expect to obtain or how it would be material to the issues raised in Defendants' motion. In short, at this juncture, Plaintiffs have neither identified the probable facts that are unavailable nor explained how additional discovery would allow them to rebut Defendants' arguments. *See Cerveny*, 855 F.3d at 1110. The request for Rule 56(d) relief is therefore denied.

## V.     Federal Civil Rights Claims

Defendants move for summary judgment on Counts I, II, III, and VI, which allege claims under §§ 1983 and 1985, on the basis that the claims are time-barred and that events occurring within the statute of limitations do not support a cause of action.

### A.     Claims Outside the Statue of Limitations

Section 1983 borrows "the residual or general personal injury statute of limitations" of the forum state. *Owens v. Okure*, 488 U.S. 235, 236 (1989); *see also Robinson v. Maruffi*, 895 F.2d 649, 653–54 (10th Cir. 1990) (applying same rule to claims under § 1985). The limitations period in New Mexico is three years. *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014); NMSA § 37-1-8. Ms. Williams filed her claims on June 30, 2022, and Plaintiffs Jane Doe 2 and Jane Doe 3 filed on April 18, 2024.[3] Therefore, only claims that accrued on or after June 29, 2019 (for Ms. Williams) or April 17, 2021 (for Jane Doe 2 and Jane Doe 3) are within the statute of limitations.

The majority of events alleged occurred prior to those dates and are therefore facially untimely. However, Plaintiffs argue the claims are not time-barred because (1) under the discovery rule, they did not accrue until a later date, and (2) the statute of limitations should be tolled based on Defendants' actions and Plaintiffs' incapacity.

---

[3] For purposes of this motion, the Court assumes that the earlier-filed complaint in Civ. No. 24-371 GJF/GBW, rather than the Second Amended Complaint filed May 17, 2024, sets the date for the statute of limitations.

1.    <u>Discovery Rule</u>

"[F]ederal law determines the accrual of section 1983 claims." *Fratus v. Deland*, 49 F.3d 673, 675 (10th Cir. 1995); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under the federal discovery rule, § 1983 claims accrue "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Kripp v. Lutoni*, 466 F.3d 1171, 1175 (10th Cir. 2006) (quoting *Johnson v. Johnson Cnty. Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991)). The plaintiff need not have "detailed knowledge of the level of culpability of each of the actors involved"; rather, the dispositive question is "whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm." *Alexander v. Oklahoma*, 382 F.3d 1206, 1215–16 (10th Cir. 2004).

Plaintiffs contend the discovery rule delays the date of accrual for Ms. Williams and Jane Doe 3[4] because, due to Dr. Berning's abuse, they were psychologically unable to recognize their injuries. In support of this theory, they attach psychological expert reports detailing the effects of Dr. Berning's coercive tactics, Plaintiffs' feelings of self-blame and denial, and their particular vulnerabilities. *See docs. 104-12, 104-14*. As Plaintiffs acknowledge, the discovery rule's standard is an objective one; it is based on the knowledge of a "reasonable person" in the plaintiff's situation. *See, e.g., Alexander,*

---

[4] Plaintiffs do not make this argument with respect to Jane Doe 2. *See doc. 94* at 25. However, having reviewed her expert report and considered the facts relevant to statutory incapacity, the Court would reach the same conclusion for Jane Doe 2 as for the other two plaintiffs.

382 F.3d at 1216 (the plaintiff "must use reasonable diligence in seeking to discover facts giving rise to a claim for relief"); *Arvayo v. United States*, 766 F.2d 1416, 1422 (10th Cir. 1985) (the question whether a plaintiff has been "reasonably diligent" is "an objective one"). However, they argue they were not on notice of the claims because Dr. Berning's "coercive abuse" made them reasonably unable to understand that they were being harmed.

Plaintiffs define the similarly situated "reasonable person" with such specificity that it is difficult to imagine how their objective standard would differ from a subjective one. *See*, *e.g.*, *doc. 94* at 19 (discussing Ms. Williams' "cognitive processes"), 26 (discussing Jane Doe 3's prior history of sexual violence that made her "uniquely susceptible"). But in any case, the record simply does not reflect that they were unable to recognize the facts giving rise to a cause of action. Plaintiffs experienced Dr. Berning's abuse—which was, under the facts alleged, severe and repeated—firsthand. They were aware of his employment by NMSU during that time period and, therefore, of the facts necessary to support a § 1983 action. *See Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006) (holding the date of accrual is "when facts that would support a cause of action are or should be apparent").

Plaintiffs' psychological expert opines that Ms. Williams' self-blame and denial prevented her from labeling the abuse as "abuse," and that—more broadly—"[m]any victims of sexual assault, coercive abuse, and even intimate partner violence fail to

identify the abuse even to themselves." *Doc. 104-12* at 27, 30.  This opinion does not

establish, however, that she was unable to ascertain the facts giving rise to a cause of

action.  The Tenth Circuit rejected a similar argument in a case involving childhood

sexual abuse.  *See Varnell*, 756 F.3d at 1215 (rejecting plaintiff's argument that accrual

was delayed because "as a teenager and young adult, [she] could not appreciate the

damage done to her").  The claims accrued at the time of the abuse because the plaintiff

"knew long before she filed suit all the *facts* necessary to sue and recover damages." *Id*.

at 1216 (emphasis added) (quoting *Wallace v. Kato*, 549 U.S. 384, 391 (2007)); *see also Doe*

*v. Bd. of Trs.*, 2024 U.S. App. LEXIS 5985, at *15 n.9 (10th Cir. Mar. 13, 2024) ("*Varnell*

conclusively disposes of the Does' argument that Jane did not fully understand the

nature and extent of her injuries until she met with a medical professional in 2019");

*Burkholz v. Joyce*, 2000 U.S. App. LEXIS 6900, at *15 (10th Cir. Apr. 17, 2000) ("The

relevant inquiry is whether Mr. Burkholz remembered the events of abuse, not whether

he was able to recognize himself as a victim of abuse.").  The expert opinion as to Jane

Doe 3 is yet more straightforward.  After detailing how Dr. Berning "grabbed [her]

butt" while hugging her in 2017, the expert report includes the following statement:

"While I knew what he did was wrong, he also helped me a lot with his knowledge

[and] experience." *Doc. 104-14* at 7.

    In short, while Ms. Williams and Jane Doe 3 may not have had a full

understanding of the harm done to them, there is no doubt they had knowledge of the

underlying facts.  The record evidence does not suggest they were experiencing

psychosis, delusions, memory loss, or other mental illness so severe that a reasonable

person similarly situated would not be on notice of Dr. Berning's wrongful conduct.[5]

This circumstance is distinct from the cases cited by Plaintiffs where courts applied the

discovery rule because of psychological inability to understand the facts.  *See Duke v.*

*Cmty. Health Connections, Inc.*, 355 F. Supp. 3d 49, 56 (D. Mass. 2019) (defendant

physician prescribed overdose of amphetamines that caused "severe mental

impairments such as paranoia and delusion" and rendered the plaintiff unable to

recognize the cause of action); *Doe v. Roe*, 955 P.2d 951, 960 (Ariz. 1998) (holding that

"[a] victim whose memory is inaccessible lacks conscious awareness of the event and

thus cannot know the facts giving rise to the cause" where plaintiff had repressed her

memories of childhood sexual abuse).  The Court therefore concludes there is no

genuine dispute that the discovery rule does not delay accrual of Plaintiffs' claims.

---

[5] In fact, it is uncertain whether any mental condition of the plaintiff is relevant to the federal discovery rule.  A number of courts have held that the objective "reasonable person" is not properly construed as one sharing the plaintiff's particular mental illness or disability.  *See, e.g., Barren v. United States*, 839 F.2d 987, 992 (3d Cir. 1988) (holding the plaintiff's mental illness did not affect the date of accrual because "the rule cannot be subjectively applied"); *Crawford v. United States*, 796 F.2d 924, 927 (7th Cir. 1986) ("If the running of the statute of limitations depended on what the particular plaintiff actually knew given his mental or other incapacities, the discovery rule would swallow most of the provisions related to tolling, at least for disabilities that affected cognition and were in existence at the time of the accident."); *Jones v. City of Los Angeles*, 2006 U.S. Dist. LEXIS 118749, at *33 (C.D. Cal. Jan. 5, 2006) ("[P]laintiff cannot seek refuge in the discovery rule unless he can allege facts to show that a reasonable person, without his disability, would [] not have been aware of his claim.").  But that question need not be resolved here.  As discussed, even assuming that the objective standard accounts for an individual's particular mental condition, Plaintiffs have failed to meet the standard.

2.    <u>Equitable Tolling</u>

Plaintiffs argue that, even if their claims are otherwise time-barred, the statute of limitations should be equitably tolled because Dr. Berning's abuse was "self-concealing" and "lull[ed]" them into inaction.  *Doc. 94* at 20 (quoting *Thompson v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 38, 53 (S.D.N.Y. 2001); *Gray v. Phillips Petro. Co.*, 858 F.2d 610, 615–16 (10th Cir. 1998)).  State law governs equitable tolling of § 1983 claims.  *Alexander*, 382 F.3d at 1217.  Under New Mexico law, equitable tolling "typically applies in cases where a litigant was prevented from filing suit because of an extraordinary event beyond his or her control."  *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 66 (N.M. 2004).  Such tolling includes "conduct by a defendant that caused the plaintiff to refrain from filing an action during the applicable period."  *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007) (citing *In re Drummond*, 945 P.2d 457, 462 (N.M. Ct. App. 1997); *Molinar v. City of Carlsbad*, 735 P.2d 1134, 1137 (N.M. 1987)).  It applies also where a party has "made a statement or action that amounted to a false representation or concealment of material facts," *Blea v. Fields*, 120 P.3d 430, 438 (N.M. 2005), which appears to be Plaintiffs' theory, *see doc. 73* at 18.

The evidence of Defendants' conduct, even viewed in the light most favorable to Plaintiffs, does not rise to this level.  As previously discussed, Plaintiffs were aware of the facts giving rise to a cause of action; Dr. Berning could not "conceal" the abuse from the victims.  *C.f. Silva v. United States*, Civ. No. 17-1224 MV/JHR, 2020 U.S. Dist. LEXIS

260955, at *8–9 (D.N.M. Jul. 20, 2020) (equitable tolling justified where the Social

Security Administration did not disclose that plaintiff's issues were caused by its

mistaken assignment of another person's social security number, rather than by identity

theft); *R.P. v. Santa Fe Pub. Sch.*, Civ. No. 18-1051 KWR/KK, 2020 U.S. Dist. LEXIS 14929,

at *11 (D.N.M. Jan. 28, 2020) (tolling justified where defendant school district "decided

not to inform parents of the alleged sexual assaults" and the plaintiffs were fourth-

graders at the time).  A reasonable fact-finder could not conclude that Defendants

engaged in "intentional false representation or concealment of material facts . . . giving

rise to a cause of action," because those facts were already known.  *See Anderson Living

Tr. v. WPX Energy Prod., LLC*, 27 F. Supp. 3d 1188, 1217 (D.N.M. 2014) (citing *Cont'l

Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 74 (N.M. 1993); *Kern ex rel. Kern v. St.

Joseph Hosp., Inc.*, 697 P.2d 135, 139 (N.M. 1985)).

      Nor have Plaintiffs shown that Dr. Berning or another defendant employed "acts

of violence or intimidation" that prevented them from filing a claim.  *See Doe v. Espanola

Pub. Sch.*, Civ. No. 17-917 KK/LF, 2019 U.S. Dist. LEXIS 22886, at *39–40 (D.N.M. Feb. 12,

2019).  Although they plausibly assert that Dr. Berning's behavior was manipulative

and coercive, there is no evidence he employed direct threats, violence, or intimidation

to prevent their bringing a cause of action.  Rather, the evidence shows their reluctance

to report his misconduct derived from his position and reputation, their trust in him,

and the perceived benefits of the association.  *See doc. 104-5* at ¶¶ 25, 30, 51 (Ms.

Williams did not feel she could question Dr. Berning's actions for fear it would "jeopardize the mentorship he was providing"); *doc. 104-6* at ¶¶ 34, 36 (Jane Doe 2 believed Dr. Berning's assurance that touching and groping her during a photoshoot was "fine" because "I looked up to him and he was a mentor to me"); *doc. 104-14* at 7 (expert report recording that while Jane Doe 3 "knew what he did was wrong, he also helped me a lot with his knowledge [and] experience").  Accordingly, Plaintiffs have not shown a genuine factual issue that they are entitled to equitable tolling.

### 3.    Incapacity

Plaintiffs also argue their claims should be tolled under NMSA § 37-1-10, which provides:

> The times limited for the bringing of actions by the preceding provisions of this chapter shall, in favor of minors and incapacitated persons, be extended so that they shall have one year from and after the termination of such incapacity within which to commence said actions.

Plaintiffs assert they were incapacitated within the meaning of § 37-1-10 because, due to the abuse, they were unable to comprehend their legal rights.  *Doc. 94* at 21, 25–27. Under New Mexico law, "[t]he test of mental capacity is whether a person is capable of understanding in a reasonable manner, the nature and effect of the act in which the person is engaged."  *Lent v. Emp. Sec. Comm'n*, 658 P.2d 1134, 1137 (N.M. Ct. App. 1982) (quoting *Matter of Estate of Head*, 615 P.2d 271, 274 (N.M. Ct. App. 1980)).  "[T]he disability must be such that the person is 'unable to manage his business affairs or

estate, or to comprehend his legal rights or liabilities.'" *Id*. (quoting 9 A.L.R. 2d 964, 965

(1950)). This test is "similar to the test for determining a person's mental capacity to

make a will" or "to make a valid confession." *Id*. (citing *McElhinney v. Kelly*, 356 P.2d

113 (N.M. 1960); *State v. Lujan*, 534 P.2d 1112 (N.M. 1975)). Courts in this district have

also looked to New Mexico's Probate Code, which defines an "incapacitated" person as

one who

> demonstrates over time either partial or complete functional impairment
> by reason of mental illness, mental deficiency, physical illness or
> disability, chronic use of drugs, chronic intoxication or other cause, except
> minority, to the extent that he is unable to manage his personal care or he
> is unable to manage his property and financial affairs.

NMSA § 38-4-14; *see also R.P.*, 2020 U.S. Dist. LEXIS 14929, at *6; *J.M. v. N.M. Dep't of

Health*, Civ. No. 07-604 RB/ACT, 2008 U.S. Dist. LEXIS 125343, at *12–13 (D.N.M. Dec.

31, 2008).

In *Lent*, the plaintiff claimed that she "suffered from depression and occasional

hysteria, that she was unable to function at her job and [that] the failure to perform her

job was the reason she was discharged." 658 P.2d at 1138. The Court of Appeals found

that "[n]one of these items address the issue of her capacity to understand her legal

right to claim compensation." *Id*. The court noted a contemporaneous physician's

opinion that she was "alert, oriented," that her thinking process was "not

inappropriate," that she was not "out of contact with reality," and that her thought

process was not "grossly disturbed." *Id*. Accordingly, the plaintiff "did not meet her burden of showing a genuine factual issue as to her mental capacity." *Id*.

Likewise, Plaintiffs in this case have not submitted evidence showing a genuine factual issue with respect to their ability to manage their affairs or to comprehend their legal rights. To be sure, Plaintiffs' expert reports document significant mental effects of Dr. Berning's abuse. *See*, *e.g.*, *doc. 104-12* at 19 (Ms. Williams' "mental health and self-esteem had plummeted" and she "became so depressed she stopped wearing makeup, gained 15–20 pounds, had no energy, and constantly felt emotionally flat and detached"), 58 (Ms. Williams still "struggle[es] with depression, anxiety, PTSD, and shame"); *doc. 104-14* at 8–10 (Jane Doe 3 exhibits lingering effects of sexual abuse and possible PTSD); *doc. 104-15* at 13–14 (Jane Doe 2's psychological testing indicates possible Somatic Symptom Disorder, attention difficulties, anxiety-related disorders including PTSD and agoraphobia, and disorders involving excessive worry). But these effects do not rise to the level of rendering Plaintiffs unable to manage their own affairs or comprehend their legal rights. Generally, the cited cases where courts have applied § 37-1-10 or similar tolling provisions involve substantially more evidence of incapacitation. *See Fratus*, 49 F.3d at 675 (plaintiff was delusional and hospitalized for severe mental illness); *J.M.*, 2008 U.S. Dist. LEXIS 125343, at *13 (plaintiffs suffered from developmental disability and were former residents of state institutions); *Roe*, 955 P.2d at 965 (evidence showed that "for a considerable period of time Plaintiff was unable to

function in day-to-day affairs" while experiencing suicidal ideation, treatment and institutionalization for her mental condition, and inability to function at work leading to unemployment).  A more analogous case is presented in *Espanola*, where the court found one of the plaintiffs was "unable to comprehend her legal rights" regarding her childhood sexual abuse despite "remain[ing] able to manage her personal care and business affairs."[6]  2019 U.S. Dist. LEXIS 22886, at *23.  Critically, however, the sexual abuse occurred when the plaintiff was in the fourth grade, and the court emphasized "the unique factual circumstances of Mr. Gregor's grooming and abuse of her as well as the impact of sexual abuse *on children generally*."  *Id*. at *27 (emphasis added); *see also Roe*, 955 P.2d at 957–60 (discussing the particular effects of childhood sexual abuse).  Plaintiffs cite no cases where a previously competent adult victim suffered mental incapacity as a result of sexual abuse.

Because Plaintiffs were adults at the time of the alleged abuse and have not demonstrated an inability to manage their affairs or comprehend their legal rights, the Court finds no genuine issue of material fact with respect to NMSA § 37-1-10.

### B.    Claims Within the Statute of Limitations

The only events alleged within the statutory period are (1) Dr. Berning and Ms.

---

[6] As to the other plaintiff, the court found she had presented evidence of being "totally incapable of managing her affairs until she became sober in early 2018"; until that point, her "life was characterized by heavy, unremitted drug use, life on the streets, and incarceration."  *Espanola*, 2019 U.S. Dist. LEXIS 22886, at *21.

Carson's post-graduation abuse of Ms. Williams, (2) Defendants' retaliation against Jane

Doe 2 for reporting her conversation with Ms. Williams in spring 2021, and (3) NMSU's

handling and dismissal of the Title IX hearing.  Plaintiffs also allege a separate theory of

ongoing "danger creation."   The Court considers each in turn.

1.    <u>Post-Graduation Abuse of Ms. Williams</u>

Plaintiffs allege and attach evidence that, from her graduation in 2017 through

August 2019, Dr. Berning and Ms. Carson engaged in ongoing sexual abuse of Ms.

Williams.  Ms. Williams' declaration states that after she graduated, toward the end of

2017, Dr. Berning and Ms. Carson asked her to move into their house, and she agreed in

order to "continue the professional mentorship relationship."  *Doc. 104-5* at ¶¶ 74–75.

Dr. Berning paid the balance of Ms. Williams' tuition, bought her a truck and put his

name on the title, demanded that she set up a bank account to which he had access,

assisted with her resume, prepared her for her nursing board examinations and drove

her to the exam site, drove her to a job interview in Denver, accompanied her to a

medical appointment in 2017, got her a job at the local medical facility where Ms.

Carson worked, and gave her detailed to-do lists at the house.  *Id*. at ¶¶ 47–48 54–58,

60–61, 66.  Ms. Williams was forced to engage in sexual activity with Dr. Berning and

with Dr. Berning and Ms. Carson together.  *Id*. at ¶¶ 62, 69.  On at least one occasion he

became physically violent and in 2017 he raped her in his home wood shop.  *Id*. at ¶ 64.

For purposes of this motion, Defendants do not deny the underlying facts.  However,

they contend that Dr. Berning and Ms. Carson's actions cannot support a federal civil rights claim because they were not taken under color of state law.

"To state a claim under § 1983, the plaintiff . . . must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Because the statute's purpose "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights," the only proper defendants in a § 1983 suit "are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (quoting *Owen v. City of Indepe.*, 445 U.S. 622, 650 (1980); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995)). For conduct to be "fairly attributed" to the state, "there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." *Id*. at 493 (quoting *D.T. ex rel. M.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1188 (10th Cir. 1990), *cert. denied*, 498 U.S. 879 (1990)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

As an initial matter, there is no doubt that the association between Dr. Berning and Ms. Williams would not have begun but for Dr. Berning's position at NMSU. But

the Tenth Circuit has made clear that this kind of but-for causation is not sufficient to establish state action. In *D.T.*, a fifth-grade teacher and basketball coach sexually abused three minor children while on a trip to raise money for a summer basketball camp. 894 F.2d at 1183–84. Although all three children were members of the school basketball team, and the summer basketball camp was advertised with fliers at the school and attended by students and their parents, it was not sponsored or funded by the school. *Id*. The court held that the sexual assault was not attributable to the state because the school had no control over the teacher during the summer months, and because "plaintiffs voluntarily participated with Epps in basketball fundraising activities which were not related to school activities, and thus, not undertaken under color of state law." *Id*. at 1188. The court rejected the plaintiffs' argument that the misconduct was attributable to the state because of the teacher's "cloak of authority," even though their association began through the student-teacher relationship at school. *Id*.

In another sexual abuse case, the Fifth Circuit rejected a similar argument that "the seduction of [the plaintiff] began at school, and the later sexual abuse would not have occurred if Asher had not first won [the plaintiff]'s trust and affection while serving as his teacher." *Becerra v. Asher*, 105 F.3d 1042, 1047 (5th Cir. 1997), *cert. denied*, 522 U.S. 824 (1997). The teacher had first "befriended and shown a special interest" in the plaintiff, an eleven-year-old boy, while the plaintiff was a student in his music class.

*Id*.  However, the sexual assault did not occur until five months after the plaintiff

withdrew from the school.  The court held the assault was not under color of state law

because it occurred after the student withdrew, and subsequent contacts between the

teacher and student were not school-sponsored or part of the teacher's duties.  *Id*.  These

cases support the proposition that post-graduation abuse of a student does not occur

under color of state law, even if the relationship originated at school.

Although Plaintiffs cite several other cases where abusers were found to have

acted under color of state law, none are closely analogous.  The post-graduation abuse

alleged by Ms. Williams is distinct from the scenario where, for example, a school

employee engages in ongoing sexual abuse of a current student, and some of that abuse

takes place on school grounds and during school hours.  *See Doe v. Taylor Indep. Sch.*

*Dist.*, 15 F.3d 443, 452 n.4 (5th Cir. 1994) (abuse was under color of state law where the

minor plaintiff's high school teacher carried on a physical relationship with her for over

a year, both on and off school grounds, during and after school hours); *M.S. v. Belen*

*Consol. Sch. Dist.*, Civ. No. 15-912 MCA/SCY, 2017 U.S. Dist. LEXIS 111301, at *17

(D.N.M. Jul. 18, 2017) (genuine fact question as to state action where a school resource

officer used his authority to develop a relationship with the minor plaintiff, including

removing her from detention and text messaging her during the school day, then took

her to his apartment where he sexually assaulted her while wearing his police uniform

and utility belt).

It is also quite different from *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1300 (11th Cir. 2001), where the plaintiff was assaulted by her supervisor after tendering her resignation, but before her job ended. Her supervisor had been sexually harassing her for several months both during and after work hours. *Id*. After a work-related function that the plaintiff was required to attend, her supervisor told the police chief that he would drive her home, used his authority as City Manager to park her car at the police department, and then followed her into her apartment, where he raped her. *Id*. at 1304. The court held the supervisor was acting under color of law because he "utilized his authority as City Manager to facilitate the assault." *Id*. at 1305. The court specifically distinguished those facts from

> cases where the performance of a state actor's official duties merely facilitated the meeting of or development of a relationship between the state actor and another person; and the state actor later, on his own time and wholly independent of his official duties, commits an assault or other constitutional tort against that person. Under those circumstances, it is clear that the state actor is not acting under color of law.

*Id*. at 1306. Implicit in the Eleventh Circuit's holding is the conclusion that, if the assault had taken place after the plaintiff no longer worked for the city, it would not have been committed under color of state law.

Finally, the present case is distinguishable from *United States v. Giordano*, 442 F.3d 30, 35 (2d Cir. 2006), where the defendant, then the mayor, engaged the services of a prostitute and her minor relatives. The court found he "actively and deliberately used

his apparent authority as mayor to ensure that the victims did not resist or report the ongoing abuse." *Id*. at 47.  He threatened the prostitute and the minors that they would "go to jail" if they told anyone about the abuse.  *Id*. at 35–36.  The victims testified that they believed him because of his position as mayor.  *Id*. at 36.  In consequence, "there was sufficient evidence on the basis of which the jury could find . . . that the abuse was 'made possible only because the wrongdoer is clothed with the authority of state law.'" *Id*. at 47 (quoting *United States v. Walsh*, 194 F.3d 37, 51 (2d Cir. 1999)).

After careful consideration of the case law and all relevant evidence, the Court is persuaded no reasonable trier of fact could find that Dr. Berning was "exercising his responsibilities" as an employee of NMSU, *see West*, 487 U.S. at 50, during his post-graduation interactions with Ms. Williams.  Nothing in Dr. Berning's position description, *see doc. 111-2*, or the other record evidence suggests otherwise.  Living with Ms. Williams, paying her tuition, managing her daily activities, and attending her medical appointments were not acts "made possible only because the wrongdoer is clothed with the authority of state law."  *See Jojola*, 55 F.3d at 492–93 (quoting *West*, 487 U.S. at 49).  They were not in the scope of Dr. Berning's duties as a professor, nor did they depend on the authority of his position.  On the contrary, they were "the product of a private individual acting in his private capacity in connection with a private activity" that Ms. Williams participated in "voluntarily," not as a required activity of NMSU.  *See D.T.*, 894 F.2d at 1186.  If, within the statute of limitations, Dr. Berning had

abused Ms. Williams while she was enrolled as a student at NMSU—even if some of that abuse took place off campus or outside of class—the undersigned agrees it would be analogous to *Taylor* and might qualify as state action. Here, however, the connection with Dr. Berning's position is simply too attenuated.

The closest questions are presented by acts that appear to have some nexus with Dr. Berning's employment at NMSU, such as when he took Ms. Williams to an office on campus and made her watch pornography on his computer, *doc. 104-5* at ¶ 63, or when he had sex with her on campus, *id.* at ¶ 69.[7] However, it is well established in this circuit that a tort committed on state property by a state employee does not necessarily involve state action. *See Jojola*, 55 F.3d at 494 (finding the defendant, a school custodian, did not act "under color of state law" when he forcibly molested a 15-year-old student in a vacant classroom). Because Ms. Williams was no longer a student after May 2017 and was not otherwise affiliated with NMSU, the Court finds insufficient nexus for Dr. Berning's acts to be "fairly attributed" to the state. *See id.* at 493.

Another close question is presented by Ms. Williams' declaration that Dr. Berning "arranged for [her] to participate with another NMSU professor in a study that was to be published." *Doc. 104-5* at ¶ 81. However, she specifies that this arrangement

---

[7] It appears based on the complaint, Ms. Williams' declaration, and Plaintiffs' briefing that these events took place before Ms. Williams graduated. However, the date is never clearly stated. Viewing the evidence in the light most favorable to Plaintiffs, the Court assumes they took place after graduation and as late as 2019.

took place in 2018, prior to commencement of the limitations period.[8]  It was preceded and followed by months of daily abuse and personal contact completely outside the scope of Dr. Berning's position.  This single connection to Dr. Berning's employment with NMSU is not sufficient, by itself, to transform two years' worth of unaffiliated conduct into state action.  Again, the nexus is simply too attenuated for Dr. Berning's conduct to be fairly attributed to the state.

Because Dr. Berning's conduct following Ms. Williams' graduation—and more particularly, his conduct after the limitations period began on June 29, 2019—did not exercise the power of the state but instead was perpetrated "on his own time and wholly independent of his official duties," *see Griffin*, 261 F.3d at 1306, the Court finds Defendants are entitled to summary judgment on those claims.

2.    Retaliation Against Jane Doe 2

The complaint alleges that Defendants retaliated against Jane Doe 2 for talking with Ms. Williams in spring 2021, and for reporting the conversation to Dr. Post.[9]

---

[8] Ms. Williams adds in her declaration: "It is my understanding that the abstract of that study was published and presented in late 2019 or 2020 with the sponsorship of NMSU and Dr. Berning."  *Doc. 104-5* at ¶ 81.  The Court finds the date of publication irrelevant.  Ms. Williams had moved out of Dr. Berning's home by that time and had no further affiliation with him, which means Dr. Berning was no longer depriving her of any rights, under color of law or otherwise.  It is also clear from Ms. Williams' statement that she was no longer involved with the study by the time of publication.

[9] Retaliation is not specifically included as a basis for Counts I, II, or III.  However, Plaintiffs allege generally in Count VI that Defendants' "discriminatory animus" may be "inferred by . . . efforts to silence, discredit, and retaliate against females that do not accept the invidious discriminatory animus[.]"  *Doc. 35* at ¶ 385.  They describe the alleged retaliation against Jane Doe 2 in detail at ¶¶ 242–73.

Plaintiffs therefore argue Jane Doe 2's claims are timely. *See doc. 94* at 22 ("Plaintiff Doe 2's claims cover the abusive sexually harassing discrimination of Berning and the *continuous and ongoing retaliation campaign* against her") (emphasis in original). They contend Jane Doe 2 was retaliated against "initially for simply taking the report from another student, then for speaking with OIE, and then apparently for being another victim and pursuing her own claims." *Id*.

Defendants' only argument with respect to retaliation is that because Jane Doe 2 met with Dr. Post on March 23, 2021, she was "aware of her alleged injuries" on that date "at the very latest." *Doc. 69* at 8. But this argument misapprehends the factual allegations. In addition to alleging retaliation for speaking with Ms. Williams, Jane Doe 2 alleges retaliation for reporting the conversation to Dr. Post. *See doc. 35* at ¶¶ 242–73. She was not yet aware of this injury on March 23, 2021, because it had not yet occurred. Consequently, the Court denies summary judgment on Jane Doe 2's claim of retaliation.

### 3.    Title IX Investigation and Hearing

Next, Plaintiffs contend their claims under § 1983 and § 1985 are timely because they relate to "the governmental dishonesty and coverup associated with the Title IX proceedings, including false representations to multiple Plaintiffs," that they claim occurred in 2021 and 2022. *Doc. 94* at 30. Count III of the complaint alleges:

> Defendants, acting with deliberate indifference, violated Plaintiff's civil rights, including the right to equal protection under the law and to be free from unlawful discriminatory practices by state actors, up to and

> including the handling of the Title IX action and dismissal and resolution
> thereof and continued isolation, invalidation and silencing of Plaintiffs.

*Doc. 35* at ¶ 355.

In order to assess Plaintiffs' claims, the Court must first determine what facts they are based on. The claim of "governmental dishonesty" appears to refer to a statement about Dr. Berning's retirement date. Plaintiffs proffer as an undisputed material fact:

> On July 13, 2022, Neva Williams appeared for the OIE hearing and
> Defendant Castille announced the matter was dismissed because Berning
> had entered into a settlement agreement with NMSU and retired at 5:00
> p.m. on July 12, 2022. *This was false.*

PUMF 85 (emphasis added).[10] In the signed settlement agreement, Dr. Berning's retirement date was retroactively set as July 13, 2022, at 5:00 PM. *Doc. 104-2.* It is difficult to conceive how Plaintiffs' civil rights could have been impacted by this one-day difference, even under the unlikely assumption that it was an intentional falsehood, rather than a simple error or a slight change between the settlement in principle and the executed agreement. To the extent Plaintiffs' argument is that Dr. Berning's retirement was not actually effected until July 28, 2022, the date the agreement was executed, the Court is likewise unpersuaded any genuine issue exists. It was not false or misleading to represent Dr. Berning's retirement date as the agreed-upon, effective date. Moreover,

---

[10] Defendants dispute this fact. *See doc. 111* at 20.

once again, it is unclear how Plaintiffs' civil rights could have been impacted by the approximately two-week delay, particularly since Dr. Berning remained on administrative leave throughout the period. In short, Plaintiffs have failed to identify how the alleged deception deprived them of any federal rights.

Plaintiffs also proffer as an undisputed material fact, under the section header "The Coverup," that after OIE proceedings began, Ms. Carson "went into the NMSU computer records system and began tampering with evidence and deleting records of her 'unofficially' teaching the lab class together with Berning." PUMF 81. The record contains an email chain between NMSU employees discussing how, after being placed on administrative leave, Ms. Carson "went into her Canvas account and deleted course material for the labs." *Doc. 104-4* at 14. They conclude that someone "will restore" the records and note that "OIE needs to know what she deleted when it is restored." *Id.* at 13. There is no evidence of a concerted "coverup," nor does the information about Ms. Carson's course material appear to implicate any of the Plaintiffs' rights.

Plaintiffs also assert that the settlement was "hidden" from Ms. Williams and repeatedly reference the "secretive manner" in which it was carried out. *Doc. 35* at ¶¶ 274–75, 277. The record shows that Ms. Williams was informed about the settlement as soon as it was reached. *See doc. 104-5* at ¶ 92 (declaring that on July 13, 2022, "the Title IX person for NMSU started the hearing by telling me that the whole thing was dismissed because NMSU had 'settled' with Dr. Berning and he retired at 5:00 the day

before"). Plaintiffs' real objection appears to be the fact that a settlement was reached at all. They allege that cancellation of the hearing "deprived Plaintiffs, in particular [Ms. Williams], of an opportunity for an objective evaluation of all relevant evidence." *Doc. 35* at ¶ 279. But they have not identified any specific right to be heard under Title IX, and the implementing regulations state that "[a] postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing." 34 C.F.R. § 106.46(g). The regulations further state:

> A recipient may dismiss a complaint of sex discrimination made through its grievance procedures under this section, and if applicable § 106.46, for any of the following reasons:
>
> [ . . . ]
>
> (ii) The respondent is not participating in the recipient's education program or activity and *is not employed by the recipient*.

*Id*. § 106.45(d)(1) (emphasis added). Plaintiffs provide no legal support for their argument that Defendants deprived them of a federal right when they vacated the hearing based on Dr. Berning's imminent retirement. They allege that if Ms. Williams and her representatives had known about the settlement, they "would have objected vehemently to the agreement that permitted Berning to quietly retire from NMSU rather face [sic] his misconduct and have it meaningfully addressed." *Doc. 35* at ¶ 281. But under Title IX, "'[s]chool administrators need not 'engage in particular disciplinary action,' and '[v]ictims do not have a right to seek particular remedial demands.'" *Escue v. N. Okla. College*, 450 F.3d 1146, 1155 (10th Cir. 2006) (quoting *Davis v. Monroe Cnty. Bd.*

*of Educ.*, 526 U.S. 629, 648 (1999); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F.

Supp. 2d 952, 965 (D. Kan. 2005)).  Plaintiffs have not shown, in their briefing or at

hearing, how the settlement deprived them of their rights.

On the other hand, there is ample evidence that Defendants took action on Ms.

Williams' complaint in accordance with Title IX.  The record reflects that NMSU placed

Dr. Berning and Ms. Carson on administrative leave, where they remained until Dr.

Berning's retirement, and that OIE interviewed numerous witnesses and issued a report

finding the allegations credible.  *Doc. 104-4.*  There is no disputing that the stated goal of

Title IX was achieved: there was no further harassment of female students by Dr.

Berning.  *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex . . . be

subjected to discrimination under any education program[.]"); *Escue*, 450 F.3d at 1156

(summary judgment in favor of defendant school was appropriate where the plaintiff

did not show that the school's response "led to further sexual harassment").  In short,

there is no evidence raising a genuine issue of "dishonesty," a "coverup," or other

wrongful action that deprived Plaintiffs of their federal rights.[11]  The Court therefore

---

[11] Though not mentioned in the briefing, the complaint also alleges several failures to meet the administrative requirements of Title IX.  *See doc. 35* at ¶¶ 278 (Defendants deprived Ms. Williams of the ability "to procure additional remedies in violation of 34 C.F.R. § 106.45(b)(1)(i)"), 280 (Defendants violated Title IX and engaged in "further harassment and discrimination of Plaintiff" by failing to provide "specific, simultaneous written notice" of the cancellation of the hearing).  The Court assumes Plaintiffs intended to reference 34 C.F.R. § 106.45(b)(1), which provides that a recipient's grievance procedures must "treat complainants and respondents equitably."  No statutory or regulatory provision is cited for the requirement of "simultaneous written notice."  At any rate, Title IX does not allow actions for failure to meet administrative requirements. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998) ("[A]lleged failure to comply with the regulations . . . does not establish the requisite actual notice and deliberate indifference.").

grants summary judgment in favor of Defendants on claims related to the Title IX investigation and dismissal.

### 4.    Danger Creation

Plaintiffs assert a separate claim based on the substantive due process right to be free from state-created danger, which they argue "would prevent accrual prior to August 2019." *Doc. 94* at 15.  The complaint alleges under Count II that Dr. Berning was a "danger" to female students and staff and that Defendants were deliberately indifferent to the risk.  *Doc. 35* at ¶¶ 340, 344–45.  There is no explicit mention of a danger-creation theory or specific allegation that Defendants "created" the danger.  But in any event, the Court finds that claims premised on danger creation are time-barred.

"To invoke the danger-creation theory, a plaintiff must show a state actor 'affirmatively act[ed] to create or increase a plaintiff's vulnerability to [] danger from private violence.'"  *T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).  After meeting those preconditions, the plaintiff must demonstrate:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Id*. (quoting *Currier*, 242 F.3d at 918).  The final element requires "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  *Id*. (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002)).

Setting aside the question whether Plaintiffs can meet the high bar of the final element, or for that matter the first one, consideration of the remaining elements shows that the claim is outside the statute of limitations.  Plaintiffs define the relevant group as "female students in the kinesiology department at NMSU" and the danger as "Defendant Berning's sexually harassing discrimination" or being "placed under the authority and power of Berning."  *Doc. 94* at 16.  At no time within the relevant statutory period for Ms. Williams' claims was she a student at NMSU, which means that by Plaintiffs' own definition she was not a member of the "specifically definable group."  At all times within the relevant period for Jane Doe 2 and Jane Doe 3, Dr. Berning was either on administrative leave or retired, which means he had no power or authority over female students and the defined risk of harm was nonexistent.  The Court therefore finds no genuine issue of fact and will grant summary judgment to Defendants on the basis that any danger-creation theory claims are time-barred.

## C.    Continuing Violation Doctrine

Finally, Plaintiffs argue their untimely federal claims can be revived because all events are subject to the continued violation doctrine.  This doctrine, first articulated by the Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, provides that a claim "will

not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." 536 U.S. 101, 122 (2002). *Morgan* was decided in the context of a Title VII hostile work environment claim, which the Court noted "is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id*. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). The doctrine "applies when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098 (10th Cir. 2019) (quoting *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 672 (10th Cir. 2016)). It can be applied to § 1983 claims. *Herrera v. City of Espanola*, 32 F.4th 980, 994 (10th Cir. 2022).

As discussed, the only timely claim remaining under Counts I, II, III, and VI is Defendants' alleged retaliation against Jane Doe 2. The Court agrees that under the continuing violation doctrine, any retaliation for speaking with Ms. Williams about Dr. Berning's abuse, even if it occurred outside the statute of limitations, is part of the same unlawful employment practice[12] and is not time-barred. *See Morgan*, 536 U.S. at 122.

Plaintiffs suggest that a reasonable jury could determine *all* acts alleged in the complaint, beginning with (or even before) the harassment of Ms. Williams, were part

---

[12] Defendants have made no substantive arguments about the alleged retaliation—such as, for example, whether Jane Doe 2's conversation with Ms. Williams qualifies as protected speech—so the Court does not reach any question beyond the statute of limitations.

of a "continuous chain of discriminatory sex abuse" including "the same failures to supervise, to intervene and to correct and the same attempts to brush such conduct under the rug." *Doc. 94* at 28. The Court disagrees. Retaliation for reporting sexual abuse is not "the same unlawful employment practice" as sexual harassment or failure to adequately supervise, train, or investigate employees; it is a different one. *See Morgan*, 536 U.S. at 122. Retaliation is a distinct type of claim with a discrete beginning—i.e., the date the plaintiff engaged in the act for which she is being retaliated against. Jane Doe 2's retaliation claim is not "premised on a series of individually unactionable occurrences that make out a violation only when combined." *Herrera*, 32 F.4th at 1002; *c.f. id*. at 993 ("Somewhat unique to a hostile work environment claim is the principle that no single discrete act gives rise to a cause of action because the claim is 'based on the cumulative effect of individual acts.'" (quoting *Morgan*, 536 U.S. at 115)). On the contrary, it is an unlawful practice in and of itself; even without showing prior discrimination, Jane Doe 2 would have a cause of action. The Court therefore declines to allow any non-retaliation based claims to go forward under the continuing violation doctrine.

## VI.    NMTCA

Counts VII and IX allege claims against all defendants and Dr. Berning, respectively, under NMSA § 41-4-6, which waives sovereign immunity for "damages resulting from bodily injury, wrongful death or property damage caused by the

negligence of public employees . . . in the operation or maintenance of any building, public park, machinery, equipment or furnishings." *Id*. § 41-4-6(a). The claims are premised on Dr. Berning's dangerous presence on NMSU's campus. *See doc. 35* at ¶¶ 389–99, 419–22. Defendants move for summary judgment on grounds that the claims are time-barred. The statute of limitations is as follows:

> Actions against a governmental entity or a public employee for torts shall be forever barred, unless such action is commenced within two years after the date of occurrence resulting in loss, injury or death, except that a minor under the full age of seven years shall have until his ninth birthday in which to file. This subsection applies to all persons regardless of minority or other legal disability.

NMSA § 41-4-15(A). Therefore, to be timely, Ms. Williams' claims must have accrued on or after June 30, 2020, and Jane Doe 2 and Jane Doe 3's claims must have accrued on or after April 18, 2022. Dr. Berning was placed on administrative leave on April 14, 2021, and remained on leave until his retirement in July 2022. This means it is impossible for Jane Doe 2 or Jane Doe 3's claims to have timely accrued. The same is true for Ms. Williams' claims: no injury to Ms. Williams from contact with Dr. Berning is alleged after August 2019, when she moved out of his house.

Plaintiffs again invoke the discovery rule, tolling under § 37-1-10, and equitable tolling. *See doc. 94* at 30. New Mexico's discovery rule is not materially different from the federal discovery rule as applied to this case. *See Martinez-Sandoval v. Kirsch*, 884 P.2d 507, 512 (N.M. Ct. App. 1994) (assuming, without deciding, that the proper test is

whether an "initially reasonable" person "*in the position of plaintiff*" should have discovered the claim (emphasis in original)).  The Court therefore concludes it does not apply to delay accrual.

By its plain terms, NMSA § 41-4-15(A) is not subject to the tolling provisions of § 37-1-10.  Some courts have nevertheless tolled the limitations period based on due process considerations because of a plaintiff's incapacity.  *See, e.g.*, *Espanola*, 2019 U.S. Dist. LEXIS 22886, at *27–28.  But this theory need not be discussed because, as previously determined, Plaintiffs were not incapacitated.  For the same reasons discussed above with respect to Plaintiffs' federal claims, the Court finds no basis for equitable tolling.

### VII.    NMCRA

Lastly, Defendants move for summary judgment on Count VIII on the basis that Plaintiffs' NMCRA claims are time-barred.  The NMCRA, NMSA §§ 41-4A-1 through 41-4A-13, prohibits the deprivation by a public body of "any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico." *Id*. § 41-4A-3(A).  However, "[c]laims arising solely from acts or omissions that occurred prior to July 1, 2021, may not be brought pursuant to the New Mexico Civil Rights Act." *Id*. § 41-4A-12.  The only events alleged after July 1, 2021, are the ongoing retaliation against Jane Doe 2 and the cancellation of the Title IX hearing.  Defendants do not

address the retaliation claim but argue that New Mexico's constitution "does not

guarantee or protect the alleged right to a Title IX proceeding."  *Doc. 69* at 12.

Plaintiffs urge that New Mexico's Bill of Rights "provides for more expansive

protection of rights" than the federal constitution.  *Doc. 94* at 31.  They cite Art. II, § 18,

which guarantees equality of rights based on sex.  They also cite Art. II, §§ 2 and 3,

which provide respectively for "popular sovereignty" and for the "right of self-

government."  *Id.* at 32.  At hearing, Plaintiffs proposed that the issue of whether

Defendants' handling of the Title IX proceedings implicated their state constitutional

rights should be certified to the New Mexico Supreme Court.  *Doc. 117* at 2.

The Court declines to certify.  That decision "rests in the sound discretion of the

federal court," *Kan. Judicial Rev. v. Stout*, 519 F.3d 1107, 1120 (10th Cir. 2008) (quoting

*Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)), and "is not to be routinely invoked

whenever a federal court is presented with an unsettled question of state law," *id*. at

1119 (quoting *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988)).  The court

should exercise "judgment and restraint" before certifying, and should do so only when

the issue is both determinative and "sufficiently novel that we feel uncomfortable

attempting to decide it without further guidance."  *Pino v. United States*, 507 F.3d 1233,

1236 (10th Cir. 2007) (citing *Delaney v. Cade*, 986 F.2d 387, 391 (10th Cir. 1993)).

In this case, whatever the exact contours of New Mexico's Bill of Rights, the

Court is confident they do not encompass the substantive right to a Title IX hearing or

the right to particular procedures in a Title IX investigation.  Plaintiffs have presented

no plausible legal basis to find a deprivation of their state constitutional rights.  Their

claims are inextricably bound up in the Title IX process, which is governed by federal

law, not by the state.  They do not argue that NMSU failed to act on Ms. Williams'

complaint after July 1, 2021, or that Dr. Berning remained on campus, or that any

further sexual abuse occurred, but rather that NMSU's implementation of its Title IX

grievance procedures was defective.  Absent supporting evidence or case law for

Plaintiffs' position, the Court finds Defendants are entitled to summary judgment on

Plaintiffs' NMCRA claims as they relate to the handling of the Title IX investigation and

hearing.

Defendants present no argument with respect to Jane Doe 2's retaliation claim

under the NMCRA.  Therefore, they have failed to meet their burden and the Court will

deny summary judgment on the NMCRA claims as they relate to retaliation.

**VIII.   Conclusion**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment

Regarding Plaintiffs' Counts I, II, III, VI, VII, VIII, and IX (*doc. 69*) is GRANTED in part

as follows:

(1) GRANTED as to Counts I, II, III, and VI, except that it is DENIED as to claims

based on retaliation against Jane Doe 2;

(2) GRANTED as to Counts VII and IX; and

(3) GRANTED as to Count VIII, except that it is DENIED as to claims based on

retaliation against Jane Doe 2.

Plaintiffs' request for relief under Fed. R. Civ. P. 56(d) (*doc.* 73) is DENIED.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**